**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re | Case No. 09-38271 |
| | (Jointly Administered) |
| SUMMIT AT COPPER SQUARE, LLC, *et al.*, | |
| | Chapter 11 |
| Debtors | Hon. Eugene R. Wedoff |

**BRIEF OF FNBN RESCON I, LLC ON CONFIRMABILITY OF A PLAN THAT DOES NOT ALLOW FOR A CREDIT BID**

FNBN Rescon I, LLC ("Lender") submits this brief on whether a plan of reorganization in this case may strip the Lender of its right to credit bid in a sale of its collateral. The Lender's right to credit bid arises under Section 23 of the Deed of Trust (Ex. 2 to Lender's Confirmation Hearing Exhibits) and under Arizona law, which provides that a beneficiary under a deed of trust "may make a credit bid in lieu of cash at sale." Ariz. Rev. Stat.. 33-810.

**Factual Background**

At this point in the case, most of the material facts are not contested. The Debtor owns 74 units that remain unsold in a 23 story condominium tower in central Phoenix, Arizona that the Debtor developed. Associated with the condominium building, the Debtor also owns about 8,000 square feet of retail space and a narrow strip of raw land.

The Lender is owed on its senior note, as of the Debtor's October 14, 2009 bankruptcy filing, $21,642,892.78.[1]  The Lender's claim is secured by a senior Deed of Trust on all of the Debtor's real property assets, junior only to about $300,000 in unpaid property taxes.  The Lender's collateral has not been valued in this case, but all agree that the value is significantly less than the amount owed to the Lender.  The Debtor does not generate sufficient net income to pay for the operating expenses of its project, and represented to the Court that it would obtain an unsecured loan of $50,000 to cover operating shortfalls for December and January.[2]  At least one provider of critical services to the Debtor's project has complained that it has not been paid for most of its post-petition charges to the Debtor.  The Debtor has paid $72,000 towards post-petition property taxes, which is less than the amount that has accrued.  The Debtor attempted to confirm a Plan of Reorganization that valued the Lender's collateral at the Debtor's determination of the collateral's liquidation value, but confirmation was denied.

The broader economic and market back drop of this case is also undisputed.  Associated with the sharp dramatic decline in the U.S. economy and real estate markets in late 2008, residential real estate in Phoenix has suffered in the last 18 months a precipitous decline in value and unit sales have dropped dramatically.  See *Arizona Home Values Continue to Slide*, East Valley Tribune, Feb. 26, 2010, at www.eastvalleytribune.com/story/151231.

The Lender has asserted in pleadings, and submitted as a hearing exhibit (for two hearings) to which no objection was made, an appraisal prepared by Timothy Love of Cushman

---

[1] See the Debtors' Amended Plans filed on February 9, 2010.  The Lender also holds a junior secured note with a balance of over $12 million.

[2] The Lender is informed that the Debtor has not received a loan for February's and March's operating shortfall and that as of February 26, 2010 the Debtor was nearly out of cash and unable to pay significant post-petition operating expenses.

Wakefield in Phoenix.[3]  Based on two recent bulk sales of unsold, new condominium units in comparable projects in central Phoenix, Mr. Love appraised the Debtor's 74 unsold units at $11.75 million and the abutting raw land at $300,000, for a total appraised value of $12.05 million.  In its most recent Plan, the Debtor proposes to sell the property for $10,750,000, although no information about a prospective buyer was provided.  The Lender has asserted the right to credit bid its claim should its property be sold by legal process.

Of course, the Lender does not expect that the Court will make a determination on the value of the property.  Rather, the Lender notes the Cushman Wakefield appraisal to inform the Court of what the Lender sees at stake in this matter.  The Lender believes, based on a recent appraisal that was based on two recent bulk sales of comparable condominium units, that the value of its collateral is at least $12 million.  Moreover, the Lender believes that with some rehabilitation (especially condominium association, which is responsible for maintenance of the project) and time, there is some reason to believe that the units might recapture some of their former value (although in all likelihood, nowhere near the $21 million owed to the Lender on its senior note, the $12 million owed to the Lender on its junior note, and the over $4 million owed on mechanics' liens).  At the very least, it is unlikely that the value of the units will decline much more.  See *Real estate experts forecast metro Phoenix market recovery in 2014,* Phoenix Business Journal, Feb. 19, 2010, at http://phoenix.bizjournals.com/phoenix/stories/2010/02/15/daily72.html.

The Lender thus sees that the Debtor's proposed sale for $10.75 million as materially below what the Lender will ultimately recover on its collateral, and that such a sale would deprive the Lender, should it so choose, the opportunity to hold the collateral until the market

---

[3] The appraisal was Exhibit 9 to the Lender's Exhibits for the February 10, 2010 confirmation hearing.

improves or to sell the units in other than a bulk fashion. Without the right to credit bid, the Lender will simply not receive the value of its collateral.

It is important to note here, as explained in an earlier pleading,[4] that the Lender was created by the FDIC to hold loans of the failed First National Bank of Arizona. The FDIC remains the principal beneficiary of any amounts collected on the loans to the Debtor. The Lender does not have its own source of capital and is not in a position to make a cash bid to purchase back its own collateral. Efforts by the FDIC to maximize recoveries on the assets of failed banks could be materially hampered if, through the vehicles the FDIC creates to collect loans, the FDIC is not allowed to credit bid on collateral that secures such loans.

## Procedural Posture of Present Matter

In its February 19, 2010 Motion to Vacate the Court's February 10, 2010 order granting the Lender relief from the automatic stay, as such motion to vacate was orally modified in open court on February 24, 2010, the Debtor proposes to sell its property under a plan of reorganization without allowing the Lender the right to credit bid its debt. The Lender has objected, asserting that such a plan cannot satisfy the fair and equitable requirements of Section 1129(b)(2)(A) of the Bankruptcy Code. The Court has directed the parties to brief whether a plan that denies a secured creditor its right to credit bid can be confirmed.

## Question Presented

The specific question to which this brief is addressed is whether Section 1129(b)(2)(A)(ii) (referred to herein as "Section A(ii)") applies to any plan that provides for a

---

[4] See docket no. 56, Lender's Objection to Motion to Compel, filed on November 30, 2009.

sale of a secured creditor's collateral. This issue, which is primarily a matter of statutory interpretation, was addressed by the Bankruptcy Court and the District Court decisions in *Philadelphia Newspapers*. Also addressed below is whether, apart from the requirements of Section A(ii), a plan that deprives the Lender in this case of its right to credit bid could ever satisfy the indubitable equivalent standard of Section 1129(b)(2)(A)(iii) (referred to herein as "Section A(iii)").

## Argument

### I.  Section A(ii) Provides to Any Plan that Provides for a Sale

The District Court in *Philadelphia Newspapers* (418 B.R. 548 (E.D. Pa. 2009)), concluded that, because the three fair and equitable standards of Section 1129(b)(2)(A) are written in the disjunctive, a plan can satisfy any one of the three, even though the form of the plan may fall squarely under one of the other provisions.[5] Thus, even though Section A(ii) deals with sales of collateral, a debtor that proposes to sell a secured creditor's collateral may proceed under Section A(iii). Because the District Court found no ambiguity in the statute, it declined to consider whether its ruling would allow for outcomes that were not consistent with other provisions of the Bankruptcy Code or with the intent of the drafters of the Code.

While the District Court's analysis is appealing because of its simplicity, it is flawed. Section 1129(b)(2)(A) gives a plan proponent three ways to cram down a secured creditor. Two of the ways are specific – the first deals with the amount and value of payments where the

---

[5] Overlooked in all of the discussion of the District Court's decision in *Philadelphia Newspapers* is that the court did not hold that a plan that did not allow for a credit bid could actually be confirmed under Section A(iii). "As a final point, it is worth reiterating what this Opinion does not cover. Specifically, the Opinion does not address whether denying the right to credit bid under the circumstances satisfies the fair and equitable or indubitable equivalent standards under section 1129."

debtor elects to retain the collateral, the second deals with sales of the collateral. The third way is general – it requires that the creditor receive the "indubitable equivalent" of its secured claim.

With this statutory structure, it will always ultimately be the case that a general provision will swallow specific provisions unless those situations that fall under a specific provision are governed by the specific provision. Once the general provision has been interpreted as allowing an easier path than an otherwise applicable specific provision, everyone will seek to follow that easier path, rendering the specific provisions superfluous. The maxim of statutory interpretation that general provisions are subject to specific provisions is designed to prevent this outcome. See *TRW v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 449 (2001) ("We doubt that Congress, when it inserted a carefully worded exception to the main rule, intended simultaneously to create a general discovery rule that would render the exception superfluous."); *In re Kmart Corporation*, 359 F.3d 866 (7th Cir. 2003)(Section 105's seeming broad power does not override specific sections of the Bankruptcy Code). See also *Cochran v. Metropolitan Life Inns. Co.*, 472 F.Supp. 827 (N.D. Ga. 1979)(in interpreting a statute with the same disjunctive structure as Section 1129(b)(2)(A) of the Bankruptcy Code, the court held that the general language of the last of a series of options did not apply where a the language of one of the specific options applied).

The District Court's analysis, by focusing exclusively on the use of "or" in Section 1129(b)(2)(A)'s list of three standards for fair and equitable treatment of a secured claim, is also contrary to the Supreme Court's admonition that a specific provision of the Bankruptcy Code should not be read in isolation. *Kelly v. Robinson*, 479 U.S. 36, 49-50(1986) (in a case

involving the interpretation of the Bankruptcy Code, the Supreme Court observed that "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."). Nearly every commentator and reported decision that has considered the present issue – whether the right to credit bid can be taken away in a plan sale – has reached the conclusion that the disjunctive language in Section 1129(b)(2)(A) cannot be read in isolation of Section 363(k) and 1111(b). *E.g.*, Klee, *All You Ever Wanted to Know About Cram Down Under the Bankruptcy Code*, 53 Am. Bankr. L.J. 133, 155 n.136 (1979) ("If the collateral is sold free and clear of the lien, then 11 U.S.C. §129(b)(2)(A)(ii) is the controlling provision.*"); In re Matrix Development Corp.*, 2009 WL 2169717 (Bankr. D. Ore. 2009), at *8 ("Section 1111(b) was enacted to protect the rights of secured creditors by ensuring that they either received full payment of their allowed claims or retained the right to retake their collateral via a credit bid at a sale, either under §363 or under [a plan]"). See also *In re SunCruz Casinos, LLC*, 298 B.R. 833, 838 (Bankr. S. D. Fla. 2001); *In re Kent Terminal Corp.*, 166 B.R. 555, 566-67 (Bankr. S.D. N.Y. 1994).

While the present case involves the right to credit bid in a sale, it could just as well involve a payment plan that does not pass muster under Section 1129(b)(2)(A)(i). For instance, what if a plan proposed to pay a secured creditor that exercised a Section 1111(b) election less than the allowed amount of its claim, even though the creditor was to receive a stream of payments with a value equal to the value of its collateral? Such a plan might be found to satisfy the indubitable equivalent test, but it would surely run afoul of Section A(i) and deprive the creditor of its rights under Section 1111(b). Yet under *Philadelphia Newspapers*, such a plan could be confirmed. And if that became the law, what debtor would

be foolish enough to try to satisfy Section A(i) where the creditor has made the Section 1111(b) election.

A thorough discussion of the statutory interpretation issue posed in this case is contained in the Bankruptcy Court's ruling in *Philadelphia Newspapers* (2009 WL 3242292, attached hereto as Exhibit A).  Looking at the various sections of the Bankruptcy Code that touch on the rights of secured creditors (Section 363(k), 1111(b), 1129(b)), the Bankruptcy Court concluded that what the debtor urged, that the right to credit bid could be dispensed with in a sale under a plan, "would produce a result demonstrably at odds with the intention of the drafters.  In such event it is well established that the intent of the drafters, rather than the strict language of the statute controls. *Ron Pair*, supra, 489 U.S. at 242..."  The Bankruptcy Court found further support in the legislative history of Section 1111(b):  "Sale of property under section 363 or under a plan is excluded from treatment under section 1111(b) because of the secured party's right to credit bid in the full amount of its allowed claim at any sale under section 363(k) of the House Amendment."   124 Cong. Rec. H11, 104 (Sept. 28, 1978) reprinted in Collier on Bankruptcy, App. Pt. 4(f)(i)(2); 124 Cong. Rec. S17420 (Oct. 6, 1978) reprinted in Collier on Bankruptcy, App. Pt. 4(f)(iii).

Although the Fifth Circuit Court of Appeals in *In re Pacific Lumber*, 584 F.3d 229 (2009), appeared to reach a conclusion similar to that of the District Court in *Philadelphia Newspapers*, that case is not apposite for two reasons.  First, the secured creditor had originally not complained of a sale under a plan without the right to credit bid where the value of the property, and thus the sale price, was to be determined by the court.  It was only after

the court's ruling on value, which disappointed the creditor, did the creditor challenge the lack of the right to credit bid.

Second, as has been noted, the Fifth Circuit made an error in its analysis that suggests that it failed to grasp the issue. The Fifth Circuit observed that the secured party could have avoided what it complained of had it made a Section 1111(b) election. However, as the Bankruptcy Court in *Philadelphia Newspapers* noted, the creditor in *Pacific Lumber* could not make the Section 1111(b) election because the plan provided for a sale of the collateral: "The Circuit Court … recharacterized the transaction as a sale, but seemingly failed to then observe that in such case the Noteholders, as recourse creditors, did not have the protection of the §1111(b) election available to them." 2009 WL 3242292 at p.8. This was not a minor goof – it left the secured creditor in the position of neither having the right to make the Section 1111(b) election or to make a credit bid, exactly the outcome the drafters of the Code sought to avoid. Perhaps the *Pacific Lumber* case can best be understood as saying that principles of estoppel apply in a confirmation proceeding, and that when a creditor acquiesces to a procedure for the handling of its claim it cannot later claim foul when the claim is valued for less than what the creditor sought.

## II.  A Sale That Denies the Lender the Right to Credit Bid Does not Afford the Lender the Indubitable Equivalent of Its Claim

Even if the only standard applicable to the present issue was the "indubitable equivalent" standard, a plan that denies the Lender the right to credit bid cannot be confirmed. The right of a secured creditor to credit bid is an essential part of the bargain with its borrower, one that even the District Court in *Philadelphia Newspapers* recognized when it

stressed that it was not addressing the merits of whether a no credit-bid plan could actually be confirmed. 418 B.R. at 563.[6] See also *In re Briggs Transp. Co.*, 35 B.R. 210, 214 (Bankr. D. Minn. 1983); *In re Octagon Roofing*, 123 B.R. 583, 592 (Bankr. N.D. Il. 1991)(J. Schmetterer); 3 Collier on Bankruptcy, ¶363.09[1], p. 363-71 (15th ed.)("The right of the creditor to offset its claim is of significant value."). As stated in many of the authorities cited above, the right to credit bid protects the creditor from having its collateral cashed out too cheaply, and gives the creditor a measure of control over the destiny of its collateral when the creditor will not be paid in full on its claim. Underlying the protections given secured creditors in Sections 363(k), 1111(b), and 1129(b)(2)(A) of the Code is that, unlike unsecured creditors, a secured creditor has an enforceable interest in the Debtor's property, an interest that is recognized and protected under the Fifth Amendment to the U.S. Constitution. See *In re Laguna*, 944 F.2d 542 (9th Cir. 1991).

Whether one could envision a circumstance where the denial of the right to credit bid did not deprive a secured creditor of the indubitable equivalent of its claim, such is plainly not the case here.[7] The Lender is deeply undersecured. It believes, and has a recent appraisal to supports its belief, that what the Debtor urges for a sales price is materially less than the value of the Lender's collateral. The market for residential real estate is likely at or near a historic

---

[6] The Fifth Circuit approved confirmation of a plan that did not allow a secured creditor to credit bid where the property was to be sold for an amount determined by the court as the value of the property. *In re Pacific Lumber Co.*, 584 F. 3d 229 (5th Cir. 2009). The decision, however, contains on page 247 an analytical flaw in its discussion of Section 1111(b) that reflects that the court may not have grasped the implications of its decision on the right of a secured creditor to protect itself from a low judicial valuation, or from a forced sale of its collateral under circumstances that might result in a depressed price for the collateral.

[7] Section 363(k) allows a court to suspend the right to credit bid for cause. There appears little if any reported authority on what might constitute cause. Of course, if the sale concerned only some of the creditor's collateral, and after the sale the creditor would retain sufficient collateral to fully secure its claim, then such cause might exist.

low. If there were ever a case where the credit bid is needed to protect the lender from the sorts of risks identified in the authorities discussed herein – the risk of being cashed out when the market is at a low point – it is this case.

### III. One Final Observation

The Lender understands that the Debtor is now proposing a plan that provides for a sale of the Debtor's property with all of the net proceeds to be paid to the Lender. The Debtor asserted in open Court that its current owners have no ownership interest in the undisclosed prospective buyer. If this is true, and there is no other link between the current principal of the debtor and the prospective buyer, it is puzzling to see why the Debtor would propose such a transaction. All the Debtor will be doing is transferring an asset to a stranger, likely at a bargain price that harms the secured creditor and does nothing for any other creditor or equity holder.

Might the Debtor attempt to surcharge the Lender's right to the proceeds from a sale of the collateral? A Section 506(c) surcharge requires some form of consent or acquiescence from the creditor and that the expenses were "incurred primarily for the benefit of the secured creditors." *In re Trim-X, Inc.,* 695 F.2d 296, 301 (7th Cir. 1982). There is no consent here. The Lender moved for relief from the automatic stay 15 days after the case was filed, and fought the motion through a full hearing and ruling. The Lender filed a second motion on February 5, 2010 and succeeded on its objection to the Debtor's Plan. It has fought this case every step of the way.

Benefit?  The Debtor has failed to keep abreast with a reserve for taxes that have accrued on the property during the case and has failed to pay the supplier of at least one critical service.  It is not known what else has been paid, or not paid, because the Debtor is two months delinquent in filing its Monthly Operating Reports.  To generate cash, the Debtor has rented portions of the collateral to itinerant residents – a use that the Lender has opposed and which Lender described earlier in this case as "a value destroying scheme of converting [the Debtor's] high-end, brand new residential project into a hotel."[8]  The Debtor could not seriously argue that it has prosecuted this case for the benefit of the Lender.  The issue here in not whether the Debtor can assert a Section 506(c) claim, but rather how large is the Lender's looming Section 507(b) claim and from what source will it be paid.

Dated:  March 1, 2010

FNBN-RESCON I LLC ("Lender"), as successor to the First National Bank of Arizona, by its Servicer, Stearns Bank

By   /s/ William J. Barrett
BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP
200 W. Madison, Suite 3900
Chicago, Illinois  60606
Phone: 312-629-5170
Facsimile: 312-984-3150

Attorney for FNBN-RESCON I LLC

---

[8] Lender's Objection And Response To Debtor's Motion To Compel Discovery Against Lender, filed on Nov. 30, 2009, docket no. 56.