UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:                                        Chapter 11
                                              Case No. 09- 38271
The Summit at Copper Square, LLC, et al       (Jointly Administered)

        Debtors.                              Hon. Eugene R. Wedoff
_____/

---

**MODIFIED FOURTH AMENDED JOINT PLAN OF REORGANIZATION OF
THE SUMMIT AT COPPER SQUARE, LLC AND
THE SUMMIT AT COPPER SQUARE COMMERCIAL LLC**

---

*Dated:* **March 24, 2010**

**ARNSTEIN & LEHR LLP
Counsel for The Summit at Copper
Square LLC, et al.**
120 S. Riverside Plaza, Suite 1200
Chicago, IL 60606
Tel: (312) 876-7100
Fax: (312) 876-0288

By: /s/ Miriam R. Stein_____
        Konstantinos Armiros
        Barry A. Chatz
        Miriam R. Stein
        www.arnstein.com

PURSUANT TO § 1125 OF TITLE 11 OF THE UNITED STATES CODE, NOTHING CONTAINED IN THIS JOINT PLAN OF REORGANIZATION (THE "**PLAN**") SHOULD BE CONSTRUED AS CONSTITUTING A SOLICITATION OF ACCEPTANCES OF THE PLAN UNTIL SUCH TIME AS THE DISCLOSURE STATEMENT (AS DEFINED HEREIN) HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, AND DISTRIBUTED, WITH APPROPRIATE BALLOTS, TO ALL HOLDERS OF IMPAIRED CLAIMS AGAINST AND IMPAIRED INTERESTS IN THE DEBTORS ENTITLED TO VOTE ON THE PLAN. THE DEBTORS RESERVE THE RIGHT TO FILE A FURTHER AMENDED OR A FURTHER AMENDED AND RESTATED PLAN AND A FURTHER AMENDED OR FURTHER AMENDED AND RESTATED DISCLOSURE STATEMENT FROM TIME TO TIME HEREAFTER. REFERENCE IS MADE TO SUCH DISCLOSURE STATEMENT FOR A DISCUSSION OF VOTING INSTRUCTIONS, THE DEBTORS' HISTORY, BUSINESS, PROPERTY, AND RESULTS OF OPERATIONS; A SUMMARY OF SIGNIFICANT EVENTS WHICH HAVE OCCURRED TO DATE IN THE BANKRUPTCY CASES; AND THE MEANS OF IMPLEMENTING AND FUNDING THE PLAN. ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THE PLAN AND THE DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

## TABLE OF CONTENTS

**ARTICLE 1   INTRODUCTION**………………………………………………………  1

**ARTICLE 2   DEFINED TERMS; RULES OF CONSTRUCTION** ....................................  3

   2.1   Defined Terms .........................................................................  3
   2.2   Rules of Construction .............................................................  13

**ARTICLE 3   TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND
            PRIORITY TAX CLAIMS**..........................................................  13

   3.1   Administrative Expense Claims.................................................  13
   3.2   Unclassified Priority Claims.....................................................  14

**ARTICLE 4   DESIGNATION OF CLASSES OF CLAIMS AND
            INTERESTS** ..............................................................................  14

   4.1   Class 1: Secured Claim of The Maricopa County Treasurer ..............  15
   4.2   Class 2: Secured Claim of FNBN-Rescon .................................  15
   4.3   Class 3: Cure Cost of Northwind Chilled Water .........................  15
   4.4   Class 4: Compromised Cure Costs ............................................
   4.5   Class 5: Unsecured Deficiency Claim of Weitz . ..........................  15
   4.6   Class 6: Unsecured Deficiency Claim of FNBN-Rescon Relating to the First
          Mortgage  ..............................................................................  15
   4.7   Class 7: Unsecured Claim of FNBN-Rescon Relating to the Mezzanine Loan
          Mortgage  ..............................................................................  15
   4.8   Class 8: Unsecured Deficiency Claims of Subordinate Lien Holders ..............  15
   4.9   Class 9: General Unsecured Claims.............................................  15
   4.10  Class 10: Equity Interests.........................................................  15

**ARTICLE 5 TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**..................  16

   5.1   Unclassified Claims ................................................................  16
   5.2   Class 1: Secured Claim of Maricopa County Treasurer ....................  16
   5.3   Class 2: Secured Claim of FNBN-Rescon ...................................  16
   5.4   Class 3: Cure Cost of Northwind Chilled Water. ...........................  18
   5.5   Class 4: Comprised Cure Costs..................................................  18
   5.6   Class 5: Unsecured Deficiency Claim of Weitz ............................  19
   5.7   Class 6: Unsecured Deficiency Claim of FNBN-Rescon Relating to the First
          Mortgage ..............................................................................  19
   5.8   Class 7: Unsecured claim of FNBN-Rescon Relating to the Mezzanine Loan
          Mortgage ..............................................................................  19
   5.9   Class 8: Unsecured Deficiency Claims of Subordinate Lien Holders ..............  20
   5.10  Class 9: General Unsecured Claims.............................................  20
   5.11  Class 10: Equity Interest .........................................................  21

**ARTICLE 6 ACCEPTANCE OR REJECTION OF THE PLAN** ...................................... 21

    6.1    Each Impaired Class Entitled to Vote Separately ............................................ 21
    6.2    Acceptance by Impaired Classes ...................................................................... 21
    6.3    Presumed Acceptance of the Plan by Unimpaired
            Classes .............................................................................................................. 22
    6.4    Impairment Controversies ................................................................................ 22

**ARTICLE 7   TREATMENT OF-EXECUTORY CONTRACTS AND UNEXPIRED
              LEASES** ............................................................................................. 22

    7.1    Assumption or Rejection of Certain Executory Contracts & Leases ................. 22
    7.2    Damages Arising from Rejection of any Executory Contract or
            Unexpired Lease ............................................................................................... 22

**ARTICLE 8 MEANS OF IMPLEMENTATION OF THE PLAN** ...................................... 23

    8.1    The New Value Contribution ............................................................................ 23
    8.2    New Value Auction ........................................................................................... 23
    8.3    Funding for Payments under the Plan ............................................................... 24
    8.4    Section 1146 Exemption ................................................................................... 25
    8.5    Effectuating Documents, Further Transactions ................................................ 25
    8.6    Preservation of Causes of Action ..................................................................... 25
    8.7    Retention of Jurisdiction .................................................................................. 25

**ARTICLE 9   PROVISIONS GOVERNING DISTRIBUTIONS** ...................................... 26

    9.1    Determination of Claims .................................................................................. 26

**ARTICLE 10 CONDITIONS PRECEDENT** ....................................................................... 26

    10.1   Conditions Precedent to Confirmation of the Plan ........................................... 27
    10.2   Conditions Precedent to the Effective Date ..................................................... 27
    10.3   Waiver of Conditions Precedent to the Effective Date ..................................... 27

**ARTICLE 11 POST CONFIRMATION ESTATES** ........................................................... 27

    11.1   Structure of Reorganized Debtors ..................................................................... 27
    11.2   Post-Confirmation Duties ................................................................................. 28
    11.3   Insurance Preservation ...................................................................................... 28
    11.4   Release of Liens ................................................................................................ 28
    11.5   No Liability for Tax Claims .............................................................................. 28

**ARTICLE 12 RETENTION OF JURISDICTION** ............................................................. 28

    12.1   General Retention ............................................................................................. 28

| | | |
|---|---|---|
| 12.2 | Specific Purpose | 29 |
| 12.3 | Closing of the Bankruptcy Cases | 31 |

**ARTICLE 13  MODIFICATION OF PLAN AND CONFIRMATION OVER OBJECTIONS** .................... 31

| | | |
|---|---|---|
| 13.1 | Modification of Plan | 31 |
| 13.2 | Confirmation over Objections | 32 |

**ARTICLE 14  MISCELLANEOUS PROVISIONS** ................ 32

| | | |
|---|---|---|
| 14.1 | No Admissions | 32 |
| 14.2 | Revocation or Withdrawal of the Plan | 33 |
| 14.3 | Further Assurances | 33 |
| 14.4 | Headings | 33 |
| 14.5 | Notices | 33 |
| 14.6 | Governing Law | 33 |
| 14.7 | Limitations on Allowance | 33 |
| 14.8 | Estimated Claims | 34 |
| 14.9 | Consent to Jurisdiction | 34 |
| 14.10 | Setoffs | 34 |
| 14.11 | Successors and Assigns | 34 |
| 14.12 | No Interest | 34 |
| 14.13 | Modification of Payment Terms | 34 |
| 14.14 | Entire Agreement | 35 |
| 14.15 | Severability of Plan Provisions | 35 |
| 14.16 | Confirmation Order and Plan Control | 35 |
| 14.17 | Computation of Time | 35 |
| 14.18 | Substantial Consummation | 35 |
| 14.19 | Plan Documents | 36 |

# ARTICLE 1
## INTRODUCTION

The Summit at Copper Square, LLC ("**Summit**") and The Summit at Copper Square Commercial, LLC ("**Summit Commercial**" and collectively, the "**Debtors**") jointly propose the following plan of reorganization (the "**Plan**") and the resolution of the outstanding Claims against and Interests in the Debtors pursuant to the provisions of Chapter 11 of the Bankruptcy Code, and requests Confirmation of the Plan pursuant to § 1129 of the Bankruptcy Code. Capitalized terms used herein shall have the meanings ascribed to such terms in Article 2.1 of the Plan. The Debtors are the joint proponents of the Plan within the meaning of § 1129 of the Bankruptcy Code.

In summary, but subject to more specific details provided herein, the Plan contemplates the funding of a New Value Contribution by the Debtors (in an amount not less than $4,000,000.00). The New Value Contribution is allocated between the Debtors as follows: (i) $3,500,000 payable to the Summit Estate; and (ii) $500,000 payable to the Summit Commercial Estate. The Summit Commercial funds shall be used for leasehold improvements to ready the Property for new tenants.

The Summit New Value Contribution shall be used to pay administrative claims, cure costs, real estate taxes for the Property, a $250,000 distribution to general unsecured creditors, to fund capital improvements for the Property and provide an operating reserve. Two Million Dollars ($2,000,000) of the New Value Contribution shall be paid to FNBN-Rescon as an initial payment on its Allowed Class 2 Claim. Other monthly payments required under the Plan will be funded by the respective Debtors' current and future operations.

As stated, the Plan contemplates a pay down of $2 Million to FNBN-Rescon. In addition, the Debtors shall make monthly payments to FNBN-Rescon over a period of ten years and a balloon payment at the end of the ten years, in the amounts set forth on the attached Exhibit 1 to this Plan.

The Plan also proposes a payment of $250,000 for holders of general unsecured claims to be distributed on a pro rata basis. Further, the Plan provides for additional distribution to general unsecured creditors as follows: (1) for a period of ten (10) years (or until the Property is sold if the Property is sold within ten (10) years of the Effective Date, the Reorganized Debtors shall contribute a percentage of Net Operating Cash to the general unsecured creditors on a pro rata basis as set forth in Section 5.10 below; and (2) in the event that the Reorganized Debtors sell their respective interests in the Property at any time within ten (10) years from the Effective Date at a net profit to the Reorganized Debtors (including payment in full of FNBN-Rescon's secured claim relating to the First Mortgage and ordinary and customary transaction costs attributed to the sale including without limitation commissions, taxes and closing costs), the Reorganized Debtors shall distribute a certain percentage of net profits to the general unsecured creditors on a pro rata basis, as set forth in Section 5.10 below.

Under § 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan cannot be solicited from the Holder of a Claim or Interest until such time as the Disclosure Statement has

1

been approved by the Bankruptcy Court and distributed to Holders of Claims and Interests.  The Disclosure Statement is being distributed simultaneously with the Plan to all parties whose votes are being solicited.  The Disclosure Statement contains, among other things, (a) a discussion of the Debtors' history, business, property, and results of operations, (b) a summary of significant events which have occurred to date in the Bankruptcy Cases, (c) a summary of the means of implementing and funding the Plan, and (d) the procedures for voting on the Plan. No materials, other than the accompanying Disclosure Statement and any Exhibits attached thereto or referenced therein, have been approved by for use in soliciting acceptances or rejections of the Plan.

ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications to the Plan set forth in Article 13 of the Plan, the Debtors expressly reserve the right to alter, amend, modify, revoke or withdraw the Plan, one or more times, prior to the Plan's substantial consummation.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THE PLAN AND IN THE ACCOMPANYING DISCLOSURE STATEMENT CONCERNING THE HISTORY OF THE DEBTORS' BUSINESS, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTORS, TRANSACTIONS TO WHICH THE DEBTORS WERE OR ARE A PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTORS AND NOT TO ANY OTHER PARTY.

THE PLAN AND THE DISCLOSURE STATEMENT HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.

THE DEBTORS HAVE NOT BEEN SUBSTANTIVELY CONSOLIDATED AND THE PLAN DOES NOT PROPOSED SUBSTANTIVE CONSOLIDATION.  THE PLAN IS A JOINT PLAN FOR ADMINISTRATIVE PURPOSES ONLY.  TO THE EXTENT THAT ANY CLAIM OR DEBT IS OWED BY ONE DEBTOR AND NOT THE OTHER, SUCH DEBTOR SHALL PAY SUCH CLAIM.   CLAIMS OWED JOINTLY BY THE DEBTORS SHALL BE PAID JOINTLY BY THE DEBTORS.

## ARTICLE 2
## DEFINED TERMS; RULES OF CONSTRUCTION

**2.1     Defined Terms**

      2.1.1   As used in the Plan, the following terms (which appear in the Plan as capitalized terms) shall have the meanings set forth below:

      "***Administrative Expense***" means (a) any cost or expense of administration of the Bankruptcy Cases that is allowed under §§ 503(b) or 507(a)(1) of the Bankruptcy Code, to the extent the party claiming any such cost or expense files an application, motion, request or other Bankruptcy Court-approved pleading seeking such expense in the Bankruptcy Cases on or before the applicable Administrative Expense Claims Bar Date, including (i) any actual and necessary costs and expenses of preserving the Estates or operating the business of the Debtors (including wages, salaries, or commissions for services rendered) incurred on or after the Petition Date, (ii) any Post-petition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in Possession in the ordinary course of their business, (iii) any Claim granted administrative priority status by a Final Order of the Bankruptcy Court, (iv) any Claim by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) due from the Debtors for any Postpetition tax year or period, and (v) compensation or reimbursement of expenses of Professionals awarded or allowed pursuant to an order of the Bankruptcy Court under §§ 330(a) or 331 of the Bankruptcy Code (including any amounts held back pursuant to an order of the Bankruptcy Court); (b) any Superpriority Claim; (c) all fees and charges assessed against the Estates under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930; and (d) any and all other costs or expenses of administration of the Bankruptcy Cases that are allowed by Final Order of the Bankruptcy Court; provided, however, that, when used in the Plan, the term "Administrative Expense" shall not include any Priority Tax Claim, or, unless otherwise expressly provided in the Plan, any of the Claims in Classes 1 through 10.  In no event shall any Claim set out in a Proof of Claim be deemed to be an Administrative Expense (except for Claim by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) due from the Debtors for any Post-petition tax year or period).

      "***Administrative Expense Claim***" means any Claim for the payment of an Administrative Expense.

      "***Administrative Expense Claims Bar Date***" means the date established by one or more orders of the Bankruptcy Court as the deadline for the filing by any creditor or other party in interest of an application, motion, request or other Bankruptcy Court-approved pleading for allowance of any Administrative Expense Claim; provided, however, that (a) unless otherwise ordered by the Bankruptcy Court, the Administrative Expense Claims Bar Date for the filing by any Professional of a final application for services rendered or reimbursement for expenses incurred through and including the Effective Date shall be no later than thirty (30) days after the Effective Date, and (b) to the extent the Bankruptcy Court has entered an order establishing a different and specific deadline for a Creditor or other party in interest to file an Administrative Expense Claim, the date set forth in such order shall be deemed to be the Administrative

Expense Claims Bar Date as to such Creditor or other party in interest. Holders of Administrative Expense Claims (including Holders of any Claims for Postpetition federal, state or local taxes) that do not file an application, motion, request or other Bankruptcy Court approved pleading by the applicable Administrative Expense Claims Bar Date shall be forever barred, estopped and enjoined from ever asserting such Administrative Expense Claims against the Debtors, any of their respective Property or Assets or the Estates, and such Holders shall not be entitled to participate in any Distribution under the Plan on account of any such Administrative Expense Claims.

"***Affiliate***" has the meaning ascribed to such term in § 101(2) of the Bankruptcy Code.

"***Allowed Amount***" means the dollar amount in which a Claim is allowed.

"***Allowed Claim***" means a Claim or that portion of a Claim which is not a Disputed Claim or a Disallowed Claim and (a) as to which a Proof of Claim was filed with the Clerk's Office on or before the Bar Date or, by order of the Bankruptcy Court, was not required to be filed, or (b) as to which no Proof of Claim was filed with the Clerk's Office on or before the Bar Date, but which has been or hereafter is listed by the Debtors in their respective Schedules as liquidated in amount and not disputed or contingent, and, in the case of subparagraph (a) or (b) above, as to which either (i) no objection to the allowance thereof has been filed within the time allowed for the making of objections as fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or an order of the Bankruptcy Court, or (ii) any objection as to its allowance has been settled or withdrawn or has been denied by a Final Order. "Allowed Claim" shall also include a Claim that is allowed by the Bankruptcy Court (a) in any contract, instrument, or other agreement or document entered into in connection with the ; (b) in a Final Order; or (c) pursuant to the terms of the Plan. "Allowed," when used as an adjective herein (such as Allowed Administrative Expense Claim, Allowed Priority Tax Claim, Allowed Priority Claim, Allowed Secured Claim, and Allowed Unsecured Claim), has a corresponding meaning.

"***Allowed Class [ ] Claim***" means an Allowed Claim in the particular Class described.

"***Allowed Interest***" means any Interest in the Debtors.

"***Assets***" means all assets of the Debtors of any nature whatsoever as of the Effective Date.

"***Ballot***" means the Ballot accompanying the Disclosure Statement upon which Holders of Impaired Claims or Impaired Interests entitled to vote on the Plan shall indicate their acceptance or rejection of the Plan in accordance with the Voting Instructions.

"***Bankruptcy Cases***" means the cases currently pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, which were commenced by the Debtors on the Petition Date and presently bear Case No. 09-38271, the jointly administered case number.

"***Bankruptcy Code***" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as in effect on the Petition Date, together with all amendments and modifications thereto that

were subsequently made applicable to the Bankruptcy Cases.

"***Bankruptcy Counsel***" means Arnstein & Lehr LLP.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, or, as the context requires, any other court of competent jurisdiction exercising jurisdiction over the Bankruptcy Cases.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, as promulgated under § 2075 of title 28 of the United States Code, and the Local Rules for the United States Bankruptcy Court for the Northern District of Illinois, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Cases.

"***Bar Date***" means March 9, 2010, the date set by the Bankruptcy Court in the Bar Date Order as the last day for filing Proofs of Claim against the Debtors in the Bankruptcy Cases, excluding Administrative Expense Claims. The Bar Date with respect to executory contracts and unexpired leases that are rejected pursuant to (a) the Plan shall be as set forth in Article 7 of the Plan, and (b) a Final Order of the Bankruptcy Court shall be as set forth in such Final Order.

"***Bar Date Order***" means an Order Fixing Time for Filing Proofs of Claims.

"***Business Day***" means any day other than (a) a Saturday, (b) a Sunday, (c) a "legal holiday" (as "legal holiday" is defined in Bankruptcy Rule 9006(a)), or (d) a day on which commercial banks in Chicago, Illinois are required or authorized to close by law.

"***Cash***" means cash, cash equivalents and other readily marketable direct obligations of the United States, as determined in accordance with generally accepted accounting principles, including bank deposits, certificates of deposit, checks and similar items. When used in the Plan with respect to a Distribution under the Plan, the term "Cash" means lawful currency of the United States, a certified check, a cashier's check, a wire transfer of immediately available funds from any source, as the case may be, drawn on a domestic bank.

"***Causes of Action***" means any and all of the Debtors' or the Debtors' respective Estates' actions, claims, demands, rights, defenses, counterclaims, suits and causes of action, whether known or unknown, in law, equity or otherwise, including (a) all avoidance actions and rights to recover transfers voidable or recoverable under §§ 502, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, and (b) any and all other claims or rights of any value whatsoever, at law or in equity, against any Creditor or other third party, including claims of the type referred to in the Disclosure Statement or in Article 8.6 of the Plan. When used in the Plan, the term "Causes of Action" shall not include any claims, obligations, suits, judgments, damages, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities released or waived by order of the Bankruptcy Court or in writing by the Debtors. A Cause of Action shall not, under any circumstances, be waived as a result of the failure to describe such Cause of Action with specificity in the Plan or in the Disclosure Statement; nor shall the Debtors be estopped or precluded under any theory from pursuing the Causes of Action. Nothing in the Plan

operates as a release of any of the Causes of Action.

"***Claim***" has the meaning ascribed to such term in § 101(5) of the Bankruptcy Code. Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Claim" shall be given the broadest possible meaning permitted by applicable law and shall include all manner and type of Claim, whenever and wherever such Claim may arise.

"***Class***" means a category of Claims or Interests classified together as described in Article 4 of the Plan.

"***Class 2 Allowed Claim***" means the Allowed Claim of FNBN-Rescon relating to the First Mortgage.

"***Clerk***" means the Clerk of the Bankruptcy Court.

"***Clerk's Office***" means the Office of the Clerk of the Bankruptcy Court located at 219 S. Dearborn, 7th Floor, Chicago, Illinois 60604.

"***Collateral***" means Property in which the Debtors' respective Estates have an interest and that secures, in whole or part, whether by agreement, statute, or judicial decree, the payment of a Claim.

"***Compromised Cure Cost Claim***" means a Claim for Cure Costs that is not paid in full on or before the Effective Date of the Plan.

"***Confirmation***" or "***Confirmation of the Plan***" means the approval of the Plan by the Bankruptcy Court at the Confirmation Hearing.

"***Confirmation Date***" means the date on which the Confirmation Order is entered on the Docket by the Clerk pursuant to Bankruptcy Rule 5003(a).

"***Confirmation Hearing***" means the hearing which will be held before the Bankruptcy Court to consider Confirmation of the Plan and related matters pursuant to § 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

"***Confirmation Order***" means the order of the Bankruptcy Court in the Bankruptcy Cases confirming the Plan pursuant to § 1129 and other applicable sections of the Bankruptcy Code, as such order may be amended, modified or supplemented, which order (including as amended, modified or supplemented) shall be in form and substance satisfactory to the Debtors.

"***Creditor***" means the Holder of a Claim, within the meaning of § 101(10) of the Bankruptcy Code, including Secured Creditors, Unsecured Creditors, and Creditors with Administrative Expense Claims, and Priority Claims.

"***Cure Costs***" means the pre-petition amount due under a lease or executory contract assumed by either Debtor pursuant to Section 365 of the Bankruptcy Code.

"***Debt***" has the meaning ascribed to such term in § 101(12) of the Bankruptcy Code.

"***Debtors***" mean collectively The Summit at Copper Square, LLC and The Summit at Copper Square Commercial, LLC.

"***Debtors in Possession***" mean collectively, Summit and Summit Commercial as debtors in possession in their respective Bankruptcy Cases.

"***Disallowed Claim***" means any Claim which has been disallowed by an order of the Bankruptcy Court, which order has not been stayed pending appeal.

"***Disbursing Agent***" means the Reorganized Debtors.

"***Disclosure Statement***" means the Disclosure Statement in support of the joint Plan of the Debtors, including all attached Exhibits attached, as submitted and filed pursuant to § 1125 of the Bankruptcy Code in respect of the Bankruptcy Cases, as such Disclosure Statement may be amended, supplemented, modified or amended and restated from time to time.

"***Disclosure Statement Approval Order***" means an Order Approving Disclosure Statement entered by the Bankruptcy Court.

"***Disputed Claim***" means any Claim (other than a Disallowed Claim) that is not an Allowed Claim and (a) as to which a Proof of Claim has been filed with the Clerk's Office or is deemed filed under applicable law or order of the Bankruptcy Court, or (b) which has been scheduled in the Schedules, and, in the case of subparagraph (a) or (b) above, as to which an objection has been or may be timely filed or deemed filed under the Plan, the Bankruptcy Code, the Bankruptcy Rules or an order of the Bankruptcy Court and any such objection has not been (i) withdrawn, (ii) overruled or denied by an order of the Bankruptcy Court, or (iii) sustained by an order of the Bankruptcy Court. In addition to the foregoing, a Disputed Claim shall also mean a Claim that is not an Allowed Claim, whether or not an objection has been or may be timely filed, if (a) the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, (b) the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim scheduled in the Schedules, (c) any corresponding Claim has been scheduled in the Schedules as disputed, contingent or unliquidated, (d) no corresponding Claim has been scheduled in the Schedules, or (e) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection. To the extent that the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, such Claim shall be a Disputed Claim only to the extent of the amount specified in the Proof of Claim which is in excess of the amount of the Claim as scheduled.

"***Distribution***" means a distribution of Cash to a Creditor on account of an Allowed Claim pursuant to the terms of the Plan.

"***Docket***" means the docket or dockets in the Bankruptcy Cases maintained by the Clerk.

"***Effective Date***" means, and shall occur on, the first Business Day on which all of the conditions to the occurrence of the Effective Date contained in Article 10.2 of the Plan have been satisfied or waived.

"***Entities Entitled to Notice***" means counsel to the Debtors, the United States Trustee, and all parties in interest entitled to receive notice pursuant to the Bankruptcy Code and Bankruptcy Rules.

"***Entity***" has the meaning ascribed to such term in § 101(15) of the Bankruptcy Code.

"***Equity Interests or Interests***" mean any and all membership interests in the Debtors, including any and all options, warrants or similar instruments for the acquisition of such membership interests, and any and all rights to subscribe to or convert into shares of such membership interests.

"***Estates***" mean the respective estates created for the Debtors by § 541 of the Bankruptcy Code upon the commencement of the Bankruptcy Cases.

"***Estimation Hearing***" means a hearing for the estimation of Claims under § 502(c) of the Bankruptcy Code.

"***Exhibit***" means an exhibit annexed to the Plan or to the Disclosure Statement, as the context requires.

"***FDIC***" means the Federal Deposit Insurance Corporation, an independent agency of the federal government created in 1933 to protect and insure deposits in banks and thrift institutions for at least $250,000.

"***Final Decree***" means the final decree entered by the Bankruptcy Court on or after the Effective Date pursuant to Bankruptcy Rule 3022.

"***Final Decree Date***" means the date on which the Final Decree, obtained after a hearing on the Entities Entitled to Notice and to such other Entities as the Bankruptcy Court may direct, has been entered on the Docket.

"***Final Order***" means (a) an order, judgment, ruling or other decree (or any revision, modification or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court as may have jurisdiction over any proceeding in connection with the Bankruptcy Cases for the purpose of such proceeding, which order, judgment, ruling or other decree has not been reversed, vacated, stayed, modified or amended and as to which (i) no appeal, petition for review, re-argument, rehearing, reconsideration or certiorari has been taken and is pending and the time for the filing of such appeal, petition for review, reargument, rehearing, reconsideration or certiorari has expired, or (ii) such appeal or petition has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further

Case 09-38271   Doc 199   Filed 03/24/10   Entered 03/24/10 21:59:22   Desc Main
Document   Page 14 of 41

appeal or petition pending; or (b) a stipulation or other agreement entered into which has the effect of any such aforesaid order, judgment, ruling or other decree with like finality.

"*First Mortgage*" means the first priority mortgage on the Property held by FNBN-Rescon, as successor in interest to FNBA.

"*FNBA*" means First National Bank of Arizona, a former banking institution, which was taken over by the FDIC.

"*FNBN-Rescon*" means FNBN-Rescon I, LLC, as successor in interest to FNBA with respect to two (2) mortgage loans to the Debtors.

"*Governmental Unit*" means a governmental unit as such term is defined in § 101(27) of the Bankruptcy Code.

"*HOA*" means the Summit Condominium Association, the homeowners' association for the Property.

"*Holder*" means (a) as to any Claim, (i) the owner or holder of such Claim as such is reflected on the Proof of Claim filed with respect to such Claim, or (ii) if no Proof of Claim has been filed with respect to such Claim, the owner or holder of such Claim as shown on the Schedules or books and records of the Debtors or as otherwise determined by order of the Bankruptcy Court, or (iii) if the owner or holder of such Claim has transferred the Claim to a third party and advised the Debtors in writing of such transfer and provided sufficient written evidence of such transfer, the transferee; and (b) as to any Interest, the record owner or holder of such Interest as shown on the books and records of the Debtors or as otherwise determined by order of the Bankruptcy Court.

"*Impaired*" refers to any Claim or Interest that is impaired within the meaning of § 1124 of the Bankruptcy Code.

"*Interests or Equity Interests*" means any and all membership interests in the Debtors, including any and all options, warrants or similar instruments for the acquisition of such membership interests, and any and all rights to subscribe to or convert into shares of such membership interests.

"*Liabilities*" means any and all liabilities, obligations, judgments, damages, charges, costs, Debts, and indebtedness of any and every kind and nature whatsoever, whether heretofore, now or hereafter owing, arising, due or payable, direct or indirect, absolute or contingent, liquidated or unliquidated, known or unknown, foreseen or unforeseen, in law, equity or otherwise, of or relating to the Debtors or any Affiliate, Subsidiary, predecessor, successor or assign thereof, or otherwise based in whole or in part upon any act or omission, transaction, event or other occurrence taking place prior to the Effective Date in any way relating to the Debtors or any Affiliate, Subsidiary, predecessor, successor or assign thereof, any assets of the Debtors (including the Assets), the business or operations of the Debtors, the Bankruptcy Cases, or the Plan, including any and all liabilities, obligations, judgments, damages, charges, costs,

Debts, and indebtedness based in whole or in part upon any Claim of or relating to successor liability, transferee liability, or other similar theory; provided, however, that, when used in the Plan, the term "Liabilities" shall not include any obligation of the Debtors expressly set forth in the Plan.

"**Lien**" means, with respect to any Asset or Property, any mortgage, pledge, security interest, lien, right of first refusal, option or other right to acquire, assignment, charge, claim, easement, conditional sale agreement, title retention agreement, defect in title, or other encumbrance or hypothecation or restriction of any nature pertaining to or affecting such Asset or Property, whether voluntary or involuntary and whether arising by law, contract or otherwise.

"**Local Rules**" means the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Cases.

"**Mechanic's Lien Claim**" means the mechanic's lien claim filed by Weitz against the Property.

"**Mezzanine Loan Mortgage**" means the mortgage on the Property held by FNBN-Rescon, as successor in interest to FNBA, relating to the mezzanine loan to the Debtors, which is subordinate to the Mechanic's Lien Claim of Weitz.

"**Net Operating Cash**" means the net cash generated by the Debtors respective operations after the Effective Date after payment of ordinary and necessary expenses, general overhead, debt service and taxes, calculated on a year end basis.

"**New Value Contribution**" means the funds to be paid as new value to the Plan which funds shall not be less than $4,000,000.

"**Person**" means any person, individual, corporation, association, partnership, limited liability company, joint venture, trust, organization, business, government, governmental agency or political subdivision thereof, or any other entity or institution of any type whatsoever, including any "person" as such term is defined in § 101(41) of the Bankruptcy Code.

"**Petition Date**" means October 14, 2009, the date on which the Debtors commenced their respective Bankruptcy Cases by filing their voluntary petitions under Chapter 11 of the Bankruptcy Code.

"**Postpetition**" means arising or accruing on or after the Petition Date and before the Effective Date.

"**Plan**" means the Fourth Amended Joint Plan of the Debtors filed on March 24, 2010, and all Exhibits to the Plan, as the same may be amended, supplemented, modified or amended and restated from time to time in accordance with the provisions of the Plan and the Bankruptcy Code.

"***Plan Documents***" means all documents that aid in effectuating the Plan, including the Exhibits to the Plan.

"***Prepetition***" means arising or accruing prior to the Petition Date.

"***Priority Claim***" means a Claim that is entitled to a priority in payment that is not an Administrative Expense Claim or a Secured Claim.

"***Professional***" means any professional employed in the Bankruptcy Cases with the approval of the Bankruptcy Court pursuant to §§ 327 or 1103 of the Bankruptcy Code.

"***Professional Fee Claim***" means a Claim under §§ 330, 311 or 503 of the Bankruptcy Code for allowance of compensation and/or reimbursement of expenses in the Bankruptcy Cases.

"***Proof of Claim***" means a proof of Claim filed with the Bankruptcy Court with respect to a Claim against the Debtors pursuant to Bankruptcy Rule 3001, 3002 or 3003.

"***Property***" means the real property commonly known as The Summit at Copper Square, the 23 story luxury high rise condominium in downtown Phoenix, Arizona with 8,700 square feet of commercial retail space on the first floor of the building.

"***Pro Rata Share***" means, with respect to any Distribution under the Plan to the Holder of an Allowed Claim in a particular Class or otherwise, a fraction, the numerator of which shall be the amount of such Holder's Allowed Claim and the denominator of which shall be the sum of all Allowed Claims in such Class, all determined as of the applicable Distribution Date.

"***Rejected Contracts***" has the meaning ascribed to such term in Article 7 of the Plan.

"***Reorganized Debtors***" means collectively The Summit at Copper Square, LLC and The Summit at Copper Square Commercial, LLC, as of the Effective Date.

"***Schedules***" means, collectively, the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors in their respective Bankruptcy Cases pursuant to Bankruptcy Rule 1007, as such schedules of assets and liabilities or statements of financial affairs have been or may be amended or supplemented from time to time.

"***Section 1111(b) Election Deadline***" means April 2, 2010, the last day to file a Section 1111(b) election as fixed by the Bankruptcy Court.

"***Secured Claim***" means any Claim that is (a) secured in whole or in part, as of the Petition Date, by a lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under § 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the Estates' interest in the value of the Collateral securing any such Claim or the amount subject to setoff, as the case may be. Except as otherwise provided in the Plan or the Bankruptcy Code, and pursuant to Section 506 of the Bankruptcy Code, if the value of a

creditor's interest in the Estates' interest in the Collateral securing such Claim or the amount subject to setoff is less than the amount of the Allowed Claim, then such deficiency shall constitute an Unsecured Claim.

"*Secured Creditor*" means any creditor holding a Secured Claim.

"*Stearns Bank*" means Stearns Bank NA, a banking institution, and servicer of FNBN-Rescon.

"*Summit*" means The Summit at Copper Square, LLC.

"*Summit Commercial*" means The Summit at Copper Square Commercial, LLC.

"*Tax Lien Claims*" means Claims against the Debtors for taxes owed by the Debtors, which are secured by a valid, perfected and unavoidable lien on any of the Debtors' real or personal property.

"*Unimpaired*" refers to a Claim that is not Impaired.

"*Unsecured Claim*" means any Claim which is not an Administrative Expense Claim, Priority Claim, or Secured Claim, including (a) any Claim arising from the rejection of an executory contract or unexpired lease under § 365 of the Bankruptcy Code, (b) except as otherwise provided in the Plan, any portion of a Claim to the extent the value of the creditor's interest in the Estates' interest in the collateral securing such is less than the amount of the Allowed Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Allowed Claim, as determined pursuant to § 506(a) of the Bankruptcy Code, (c) any Claim arising from the provision of goods or services to the Debtors prior to the Petition Date, (d) any Claim designated as an Unsecured Claim elsewhere in the Plan.

"*Unsecured Creditor*" means any creditor holding an Unsecured Claim.

"*Voting Deadline*" means April 2, 2010, the last day to file a ballot accepting or rejecting the Plan as fixed by the Bankruptcy Court, unless such date is extended by order of the Bankruptcy Court.

"*Voting Instructions*" means the instructions for voting on the Plan contained in the section of the Disclosure Statement entitled "Voting Instructions."

"*Weitz*" means The Weitz Company, LLC, the general contractor for the Property.

2.1.2   Any capitalized term used in the Plan that is not defined in the Plan but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be (with the Bankruptcy Code or the Bankruptcy Rules, as the case may be, controlling in the case of a conflict or ambiguity).

**2.2      Rules of Construction**

For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such contract, instrument, release, indenture or other agreement or document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit means such document or Exhibit as it may have been or may be amended, modified or supplemented; (d) if the Plan's description of the terms of an Exhibit is inconsistent with the terms of the Exhibit, the terms of the Exhibit shall control; (e) unless otherwise specified, all references in the Plan to Articles and Exhibits are references to Articles and Exhibits of or to the Plan; (f) unless the context requires otherwise, the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular Article or section or subsection of the Plan; (g) any phrase containing the term "include" or "including" shall mean including without limitation; (h) all of the Exhibits referred to in the Plan shall be deemed incorporated herein by such reference and made a part hereof for all purposes; (i) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; and (j) the rules of construction set forth in § 102 of the Bankruptcy Code shall apply in the construction of the Plan, to the extent such rules are not inconsistent with any other provision in this Article 2.2.

## ARTICLE 3  TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims have not been classified in the Plan. The treatment accorded to Administrative Expense Claims is set forth below in this Article 3.

**3.1      Administrative Expense Claims**

3.1.1    Except as otherwise provided below, each Holder of an Allowed Administrative Expense Claim shall be paid (a) on the Effective Date, an amount, in Cash equal to the Allowed Amount of its Administrative Expense Claim, in accordance with § 1129(a)(9)(A) of the Bankruptcy Code, or (b) under such other terms as may be agreed upon by the Holder of such Allowed Administrative Expense Claim and the Debtors, or (c) as otherwise ordered by the Bankruptcy Court.

3.1.2    All fees and charges assessed against either Estate under Chapter 123 of Title 28, United States Code, 28 U.S.C. §§ 1911-1930, through the Effective Date shall be paid to the United States Trustee by the respective Debtors by no later than thirty (30) days following the Effective Date. At the time of such payment, the Debtors shall provide to the United States Trustee an appropriate affidavit indicating the disbursements for the relevant periods. Following the Effective Date, any such fees required pursuant to 28 U.S.C. § 1930(a)(6) arising or accruing from Distributions made by the Debtors or made under the Plan shall also be paid by the Debtors.  All such payments to the United States Trustee shall be in the appropriate sum required

pursuant to 28 U.S.C. § 1930(a)(6) based upon the applicable disbursements for the relevant post- confirmation periods and shall be made within the time period set forth in 28 U.S.C. § 1930(a)(6), until the earlier of (i) the closing of the Bankruptcy Cases by the issuance of a final order by the Bankruptcy Court on the Final Decree Date, or (ii) the entry of an order by the Bankruptcy Court dismissing the Bankruptcy Cases or converting the Bankruptcy Cases to another chapter under the Bankruptcy Code. The Debtors shall provide to the United States Trustee at the time of each post-confirmation payment an appropriate affidavit indicating the disbursements for the relevant periods.

3.1.3    All Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Bankruptcy Cases to the extent not previously paid by the Debtors, shall be paid by the Debtors in the ordinary course of business in accordance with contract terms or as may be otherwise agreed upon by the Holder of such Allowed Administrative Expense Claim and the Debtors, or prior to the Effective Date, whichever later.

3.1.4    Notwithstanding the above, Allowed Professional Fee Claims shall be paid in accordance with applicable orders of the Bankruptcy Court and the Bankruptcy Code and only after appropriate order(s) allowing such fees and expenses have been entered.  Professional Fees incurred after the Confirmation Date shall be paid in the ordinary course of the Debtors' business and without need for prior Court approval.

**3.2      Unclassified Priority Claims**

Summit owes approximately $554,000 to the City of Phoenix for construction taxes.

Summit shall pay all Allowed Priority Tax Claims in full in equal payments over a period of five (5) years calculated as of the Petition Date with payments to commence on or before the Effective Date and on the first (1st) day of each month thereafter until the unpaid balance of the Priority Tax Claim is paid in full, with such monthly payments not to exceed sixty (60) months from the Petition Date.

The Debtors do not believe there are any other Unsecured Priority Claims other than the foregoing claim of the City of Phoenix.

**ARTICLE 4**
**DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS**

Pursuant to § 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. A Claim or Interest (a) is classified in a particular Class only to the extent the Claim or Interest qualifies within the description of that Class and (b) is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class. Unless otherwise expressly stated, the Classes of Claims set forth below include Claims against the Debtors that qualify within the description of that Class.  For purposes of the Plan, the Claims and Interests are classified as follows:

**4.1     Class 1:          Secured Claim of The Maricopa County Treasurer**

Class 1 consists of the Secured Claim of The Maricopa County Treasurer.

**4.2     Class 2:          Secured Claim of FNBN-Rescon**

Class 2 consists of the Secured Claim of FNBN-Rescon by virtue of the First Mortgage.

**4.3     Class 3:          Cure Cost of Northwind Chilled Water**

Class 3 consists of Cure Costs owed to Northwind Chilled Water.

**4.4     Class 4:          Compromised Cure Costs**

Class 4 consists of the Compromised Cure Costs owed to Weitz and the HOA.

**4.5     Class 5:          Unsecured Deficiency Claim of Weitz**

Class 5 consists of the Unsecured Deficiency Claim of Weitz by virtue of the Mechanic's Lien
Claim.

**4.6     Class 6:          Unsecured Deficiency Claim of FNBN-Rescon Relating to the First
                            Mortgage**

Class 6 consists of the unsecured deficiency claim of FNBN-Rescon relating to the portion of the
First Mortgage that is Unsecured

**4.7     Class 7:          Unsecured Claim of FNBN-Rescon Relating to the Mezzanine Loan
                            Mortgage**

Class 7 consists of the unsecured claim of FNBN-Rescon relating to the Mezzanine Loan
Mortgage that is fully Unsecured.

**4.8     Class 8:          Unsecured Deficiency Claims of Subordinate Lien Holders**

Class 8 consists of the Claims secured by liens on the Property that are subordinate to the liens of
FNBN-Rescon and Weitz including without limitation the Liens of the HOA.

**4.9     Class 9:          General Unsecured Claims**

Class 9 consists of all Unsecured Claims not otherwise classified in the Plan.

**4.10    Class 10:         Equity Interests**

Class 10 consists of all Equity Interests in the Debtors.

## ARTICLE 5
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

Claims and Interests shall be treated under the Plan in the manner set forth in this Article 5. Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Interests.

**5.1     Unclassified Claims**

Holders of Allowed Administrative Expense Claims and Priority Tax Claims shall receive the treatment set forth in Article 3 of the Plan.

**5.2     Class 1: Secured Claim of Maricopa County Treasurer**

5.2.1    Class 1 consists of the Secured Claim of the Maricopa County Treasurer.

5.2.2    On the later of (i) the Effective Date; or (ii) the date when real estate taxes are due, the Debtors shall pay all real estate taxes due with respect to the Property to the Maricopa County Treasurer in full. The Maricopa County Treasurer shall retain its Lien on the Property until its Allowed Claims are paid in full.

Upon Confirmation of the Plan, and so long as the Reorganized Debtors makes timely payments under the Plan, the Maricopa County Treasurer shall not issue tax certificates or otherwise effect a sale of the tax certificates relative to the Property.

5.2.3    Class 1 is Unimpaired under the Plan.

**5.3     Class 2: Secured Claim of FNBN-Rescon**

5.3.1    Class 2 consists of the Secured Claim of FNBN-Rescon based upon its election to treat its Claim as a Section 1111(b) claim. Pursuant any Section 1111(b) election made by FNBN-Rescon on or before the Section 1111(b) Election Deadline, FNBN-Rescon's Claim relating to the First Mortgage shall be allowed in the amount of $21,642,892.78 ("Allowed Class 2 Claim").

5.3.2    For the purposes of the treatment of FNBN-Rescon's Allowed Class 2 Claim, the Property shall be valued at $13,770,000, but the secured portion of the Allowed Class 2 Claim shall be $12,968,393 reflecting the priority tax lien claims of Maricopa County for real estate taxes and the City of Phoenix for city taxes in the collective amounts of $801,607.

5.3.3     FNBN-Rescon shall retain its Lien on the Property to the full extent of its Allowed Class 2 Claim, until such Allowed Class 2 Claim is paid in full.

5.3.4    FNBN-Rescon shall receive on account of its Allowed Class 2 Claim the

following:

(i)     Payment on or before the Effective Date in the amount of $2 Million  on the Allowed Class 2 Claim.

(ii)    A stream of monthly payments by the Debtors in the amounts set forth on the attached Exhibit 1 (listed under the monthly payments column under Proposed Interest Schedule) and specifically $65,000 per month for the first twelve months after the Effective Date (commencing 30 days after the Effective Date); $75,000 per month for the second year after the Effective Date; $78,000 per month for the third year after the Effective Date; and $80,000 per month for years 4-10 after the Effective Date.

(iii)   the monthly payments shall commence 30 days after the Effective Date of the Plan and continue thereafter for a period of ten years per Exhibit 1;

(iv)    in the event that any condominium units at the Property are sold, the net proceeds of sale after payment of ordinary and customary closing costs attributed to the sale including without limitation commissions, taxes and closing costs, shall be paid to FNBN-Rescon on account of its Allowed Class 2 Claim;

(v)     in the event that the Property is sold, the net proceeds of sale after payment of ordinary and customary closing costs attributed to the sale including without limitation commissions, taxes and closing costs, shall be paid to FNBN-Rescon on account of the unpaid portion of its Allowed Class 2 Claim;

(vi)    on the ten (10) year anniversary of the Effective Date of the Plan, FNBN-Rescon will be paid a balloon payment in the amount set forth on Exhibit 1, less any payments made pursuant to Sections 5.3.4(iv) and (v) above.

(vii)   The gross amount of the payments listed in subsection (ii) plus the $2,000,000 payment shall be $11,336,000.  Assuming no other payments are made pursuant to subsections (iv) or (v), a balloon payment of $10,414,000 shall be paid on the tenth anniversary of the Effective Date, and with that payment, total payments to FNBN-Rescon shall be $21,642,892.78, the full amount of the Allowed Class 2 Claim.  Based on a discount rate of 8.4%, the present value of the foregoing payments shall equal the secured portion of the Allowed Class 2 Claim, $12,968,393. This satisfies the requirements of Section 1129(b)(2)(A)(i)(II) which provides in pertinent part that "(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property …" 11 U.S.C. §1129(b)(2)(A)(i)(II).

5.3.5    Upon written request of FNBN-Rescon, FNBN-Rescon shall be entitled to quarterly financial reports by the Reorganized Debtors.

5.3.6    The following shall constitute an event of default on the Debtors' obligations to FNBN-Rescon with respect to its Allowed Class 2 Claim ("Class 2 Event of Default"): (i) failure to make any of the required payments under Section 5.3.4 above; (ii) failure to maintain proper insurance on the Property; (iii) further encumbrance of the Property without notice to FNBN-Rescon; and (iv) failure to provide financial reporting to FNBN-Rescon pursuant to Section 5.3.5.  Upon written notice of an Event of Default, the Debtors or the Reorganized Debtors, as the case may be, shall have thirty (30) days to cure the Class 2 Event of Default ("Cure Period"). In the event that the Debtors fail to cure a Class 2 Event of Default within the Cure Period, FNBN-Rescon shall be entitled to exercise its Lien rights against the Property.

5.3.7    The Allowed Class 2 Claim is impaired and entitled to vote on the Plan.

## 5.4    Class 3: Cure Cost of Northwind Chilled Water

5.4.1    Class 3 consists of Cure Cost of Northwind Chilled Water relating to pre-petition amounts owed by Summit to the Northwind Chilled Water pursuant to the parties' executory contract to assumed by Summit pursuant to Section 365 of the Bankruptcy Code.

5.4.2    Under the Plan, the Cure Cost of Northwind Chilled Water (in addition to any Allowed Administrative Claim of Northwind Chilled Water) shall be paid in full on or before the Effective Date.  Class 3 shall not be entitled to interest on its Claim.

5.4.3    Class 3 is Unimpaired and not entitled to vote on the Plan.

## 5.5    Class 4: Compromised Cure Costs

5.5.1    Class 4 consists of Compromised Cure Costs of Weitz and the HOA relating to pre-petition amounts owed by the respective Debtors under executory contracts assumed by the respective Debtors pursuant to 365 of the Bankruptcy Code.

5.5.2    Weitz is the holder of a Cure Cost claim against the Debtors for its warranty contract to be assumed by the Debtors.

5.5.3    The HOA is a holder of a Cure Cost claim against Summit relating to the Homeowner's Declaration.  The HOA claim shall be assumed by Summit.

5.5.4    The Debtors are assuming their respective obligations to Weitz under the warranty contracts in the collective amount of $100,000 and Summit is assuming its obligations to the HOA under the Homeowners Declaration in the amount of $165,000.  The Debtors shall pay the respective amounts due on the Compromised Cure Costs of Weitz and the HOA over a period of one (1) year in equal monthly payments with payments to commence on or before the Effective Date.

5.5.5   Class 4 is Impaired and entitled to vote on the Plan.

**5.6    Class 5: Unsecured Deficiency Claim of Weitz**

5.6.1    Class 5 consists of the Unsecured Deficiency Claim of Weitz relating to its Mechanic's Lien Claim which is subordinate to the First Mortgage, but has priority over the Mezzanine Loan Mortgage.

5.6.2   The Weitz Unsecured Deficiency Claim totals $3,778,006.00 for work performed by Weitz as the general contractor for the Property, which is evidenced by the Mechanic's Lien Claim.

5.6.3   Pursuant to Section 502(a) of the Bankruptcy Code and the Plan, Weitz shall have an Allowed Unsecured Claim relating to its Mechanic's Lien Claim in the amount of $3,778,006.00 as evidence by the documentation attached to Weitz's Response in Opposition to the Motion of FNBN-Rescon I LLC for Relief from the Automatic Stay without need to file a Proof of Claim.

5.6.4   The Plan shall constitute an objection to the Holders of Class 5 Claims, objecting to the secured status of such Claims pursuant to Section 506(a) and rendering such Claims Unsecured Claims.

5.6.5   Weitz shall retain any and all of its rights against Chicago Title & Trust to recoup some or all of its Mechanic's Lien Claim.  In the event that Weitz receives funds from Chicago Title & Trust for its Mechanic's Lien Claim prior to Confirmation of the Plan, Weitz's Claim against the Debtors shall be reduced accordingly.

5.6.6   Under the Plan, Holders of Allowed Claims in Class 5 shall be treated in the same manner as the Holders of Allowed Claims in Class 9 and shall be entitled to distribution as a Class 9 creditor.

5.6.7   Class 5 is Impaired and entitled to vote on the Plan.

**5.7    Class 6: Unsecured Deficiency Claim of FNBN-Rescon Relating to the First Mortgage**

Pursuant to FNBN-Rescon's Section 1111(b) election, FNBN-Rescon has waived its deficiency claim against the Debtors.  Therefore, there are no Holders of Class 6 Claims against the Debtors.

**5.8    Class 7: Unsecured Claim of FNBN-Rescon Relating to the Mezzanine Loan Mortgage**

5.8.1   Pursuant to Section 506(a) of the Bankruptcy Code, and the Plan, FNBN-Rescon shall have an Unsecured Claim relating to the Mezzanine Loan Mortgage in the approximate

amount of $11,500,000.

5.8.2    Under the Plan, Holders of Allowed Claims in Class 7 shall be treated in the same manner as the Holders of Allowed Claims in Class 9, and shall be entitled to share in the pro rata distribution with Class 9 Claim Holders.

5.8.3    The Plan shall constitute an objection to the Holders of Class 7 Claims, objecting to the secured status of such Claims pursuant to Section 506(a) and rendering such Claims Unsecured Claims.

5.8.4    Class 7 is Impaired and entitled to vote on the Plan.

**5.9    Class 8: Unsecured Deficiency Claims of Subordinate Lien Holders**

5.9.1    Class 8 consists of Unsecured Deficiency Claims of Subordinate Lien Holders which are subordinate to the Secured and Deficiency Claims of FNBN-Rescon and the deficiency claim of Weitz.  The statutory lien claims of the HOA are included in this Class.  The Debtors do not believe any other statutory or mechanic's lien claims are owed.

5.9.2    The HOA shall waive any pre-petition claims against Summit in exchange for assumption of its executory contract and the payments set forth in Section 5.5.

5.9.3    Class 8 is Impaired and entitled to vote on the Plan.

**5.10    Class 9: General Unsecured Claims**

5.10.1    Class 9 consists of all Unsecured Claims not otherwise classified in the Plan.

5.10.2    The Debtors shall set aside $250,000 of the New Value Contribution (the "**Set Aside Amount**") for payments to the Holders of Allowed Claims in Class 9 on a *pro rata* basis. The Pro Rata distribution shall be made on or before sixty (60) days following the Effective Date of the Plan.

5.10.3    In addition to the Pro Rata distribution set forth in Section 5.10.2 above, Holders of Allowed Class 9 Claims shall be entitled to the following additional treatment:

5.10.3.1    For a period of ten (10) years (or until the Property is sold if the Property is sold within ten (10) years of the Effective Date), the Reorganized Debtors shall contribute a percentage of their respective Net Operating Cash to the general unsecured creditors on a pro rata basis, with such payments to commence on March 15, 2011 and due on each March 15th thereafter for a period of ten (10) years from the Effective Date, as follows: Years 1 through 3 from the Effective Date: ten (10%) percent of Net Operating Cash; Years 4 though 6 from the Effective Date: five (5%) percent of Net Operating Cash; and Years 7 through 10 from the Effective Date: two and one-half (2½%) percent of Net Operating Cash.

5.10.3.2    In the event that the Reorganized Debtors sell their respective Property at any time within ten (10) years from the Effective Date at a net profit to the Reorganized Debtors (including payment in full of FNBN-Rescon's secured claim relating to the First Mortgage and ordinary and customary transaction costs attributed to the sale including without limitation commissions, taxes and closing costs) the Reorganized Debtors shall distribute a certain percentage of each dollar of net profit to Holders of Allowed General Unsecured Claims on a Pro Rata basis within thirty (30) days of the closing on such sale, as follows: If a sale occurs at any time from the Effective Date through Year 3 following the Effective Date, the percentage shall be 10%; in Year 4 through 6, the percentage is 5% and in Years 7 through 10, the percentage is 2.5% of the net profit.

5.10.4  Class 9 is Impaired under the Plan.

**5.11    Class 10: Equity Interest**

5.10.1  Class 10 consists of all Equity Interests in the Debtors.

5.10.2 Holders of Allowed Claims in Class 10 shall receive no Cash Distribution on account of its Equity under the Plan.  Upon confirmation, Equity Interest Holders shall retain their respective Equity Interest in the Reorganized Debtors.

5.10.3  Class 10 is Impaired under the Plan.

**ARTICLE 6**
**ACCEPTANCE OR REJECTION OF THE PLAN**

**6.1    Each Impaired Class Entitled to Vote Separately**

Except as otherwise provided in Article 6.4 or in any enforceable intercreditor contract, subordination agreement or agreement, the Holders of Claims or Interests in each Impaired Class of Claims or Interests shall be entitled to vote separately to accept or reject the Plan.

**6.2    Acceptance by Impaired Classes**

Classes 2, 4, 5, 6, 7, 8 and 9 are Impaired under the Plan. Pursuant to § 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to § 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to § 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan. Pursuant to § 1126(d) of the Bankruptcy Code, an Impaired Class of Interests shall have accepted the Plan if the Holders (other than any Holder designated pursuant to § 1126(e) of the

Bankruptcy Code) of at least two-thirds in amount of the Allowed Interests actually voting in such Class have voted to accept the Plan.

**6.3    Presumed Acceptance of the Plan by Unimpaired Classes**

Classes 1 and 3 are unimpaired and are presumed to have accepted the Plan.

**6.4    Impairment Controversies**

If a controversy arises as to whether any Claim or Interest, or any Class of Claims or Class of Interests, is Impaired under the Plan, such Claim, Interest or Class shall be treated as specified in the Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Claim or Interest, or a particular Class of Claims or Class of Interests, under the Plan.

**ARTICLE 7**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**7.1    Assumption and Rejection of Certain Executory Contracts & Leases**

Pursuant to §§ 365 and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that existed between the Debtors and another Person or Entity as of the Petition Date, shall be deemed rejected by the Debtors as of the Effective Date (collectively, the "**Rejected Contracts**"), unless previously assumed pursuant to order of the Bankruptcy Court or there is pending before the Bankruptcy Court on the Confirmation Date a motion to assume any executory contract or unexpired lease. Entry of the Confirmation Order shall constitute approval of the rejection of the Rejected Contracts.  Notwithstanding the foregoing, the Debtors shall assume the Northwind Chilled Water contract pursuant to Section 365of the Bankruptcy Code.

**7.2    Damages Arising from Rejection of any Executory Contract or Unexpired Lease**

Any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court and served upon the Debtors on the earlier of (1) thirty (30) days following the date of any order approving the rejection or (2) thirty (30) days following the Confirmation Date, or such Claim shall be forever barred and unenforceable against the Debtors' respective Estates. The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith. Such Claims, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Class 9 Allowed Claims.

## ARTICLE 8
## MEANS OF IMPLEMENTATION OF THE PLAN

**8.1     The New Value Contribution**

The Interest Holders of Summit, or a third party on behalf of the Interest Holders, will contribute a minimum of $3,500,000, and Interest Holders of Summit Commercial, or a third party on behalf of such Interest Holders will contribute a minimum of $500,000, as the New Value Contribution of the Debtors.  The New Value Contribution shall be made available on the Effective Date for distribution pursuant to the terms of the Plan.

The New Value Contribution by Summit Commercial shall be used to fund, at a minimum, new tenant improvements to the commercial portion of the Property.

The New Value Contribution by Summit shall be used to fund, at a minimum, the payment of Allowed Administrative Claims, an amount necessary to cover the balance of the real property tax liability for the 2009 tax year, to fund the $250,000 set aside amount for the Holders of Allowed Claims in Class 9 and funding of Cure Costs.  The New Value Contribution shall also be used to pay down the Allowed Class 2 Claim by $2 Million.  The remaining amount of the New Value Contribution shall be used to fund operations of the Reorganized Debtors.

**8.2     New Value Auction**

The New Value Contribution shall be subject to higher or better offers.  In the event that an entity offers more than the New Value Contribution for the purchase of the equity in the Reorganized Debtors, the Debtors shall conduct an auction for the sale of the equity in the Reorganized Debtors at the Confirmation Hearing.  The highest and best offer at the auction shall constitute the New Value Contribution and the offeror shall constitute the new Interest holder(s) in the Reorganized Debtors.

Parties wishing to overbid the current offer of the New Value Contribution for the equity interests in the Reorganized Debtors must (i) provide a written offer to the Debtors on or before the Confirmation Hearing setting forth the offeror's name, contact information and amount of offer; (ii) prior to the Confirmation Hearing, submit a cashier's check in the amount of $1,000,000 payable to the Debtors ("Deposit") and provide evidence of ability to pay any additional amounts offered; (iii) make an offer in excess of the New Value Contribution; and (iv) be present at the Confirmation Hearing.

All offers and submissions of Deposits must be made on or before the Confirmation Hearing and sent to Debtors' counsel: Konstantinos Armiros, Arnstein & Lehr LLP, 120 S. Riverside Plaza, Suite 1200, Chicago, IL 60606, Fax: (312) 876-0288, karmiros@arnstein.com.

**8.3    Funding for Payments under the Plan**

The Debtors' operations post-confirmation are projected to generate funds sufficient to cover all monthly payments required under the Plan not otherwise funded by the New Value Contribution.

With respect to Summit, as disclosed in the Disclosure Statement and set forth in greater detail in the Debtors' Cash Projections attached to the Disclosure Statement as Exhibit 3, for the last approximately 1½ years, Summit has evaluated and initiated steps to reconfigure the unsold units for upscale, condominium-style leisure, commercial and extended-stay hotel lodging, to the marketed as "The Summit Inn." Hotel rooms would be rented at competitive rates given the proximity to athletic and convention destinations and the upscale layout and furnishings of the individual units.

Prior to the Petition Date, Summit negotiated the economic terms of an operations agreement with AZUL Hospitality Group, who are owners and operators of luxury brand properties on the West Coast and a Starwood preferred operator. Summit proposes that upon the effective date of the Plan, AZUL would take over management and operation of the hotel units and would provide condo association management for the Property.

The foregoing proposal is conditioned upon the continued ownership of the Property by the Debtors. Insofar as, under the condominium declaration, only the "Declarant" (Summit) or the Condominium Association would be permitted to rent the unsold units on a short-term basis pursuant to a hotel operation. Accordingly, in order to maximize value of the Property through a partnership with AZUL Hospitality, the Reorganized Debtors need to maintain ownership and control of the Property.

The net income to Summit from the operation of the Property as an upscale commercial and extended stay hotel is projected to be sufficient to meet Summit's financial obligations under the Plan, as set forth in the attached Exhibit 1. Further, Summit intends to continue to market the condo units for sale. The net proceeds of sale will be paid to FNBN-Rescon to reduce the indebtedness of its secured claim.

With respect to Summit Commercial, Summit Commercial shall use the New Value Contribution toward tenant improvements of the commercial space of the Property. Summit Commercial intends to lease 8,000 square feet of the commercial space to AZUL Hospitality Group which will operate a restaurant/nightclub in the space. The remaining 2,000 square feet will be leased to a breakfast/diner operator.

As set forth in greater detail in the attached Exhibit 1, the net rental income to Summit Commercial will be sufficient to satisfy the operational expenses of Summit Commercial. Prior to leasing the space, the New Value Contribution shall be sufficient to satisfy the tenant improvement and upstart costs. The information set forth in the cash projections set forth in Exhibit 3 to the Disclosure Statement are incorporated herein by reference.

**8.4     Section 1146 Exemption**

Pursuant to § 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any security or the making, delivery or recording of any instrument of transfer pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or the revesting, transfer or sale of any real or personal Property of, by or in the Debtor pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**8.5     Effectuating Documents; Further Transactions**

The Debtors shall be authorized to, execute, deliver, file, or record such contracts, instruments, releases, mortgages, and other agreements or documents, and take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan or to otherwise comply with applicable law.

**8.6     Preservation of Causes of Action**

Unless Causes of Action against an entity are or have been expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or the Order approving same, the Debtors expressly reserve all Causes of Action and unknown Causes of Action for later adjudication and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the Confirmation or consummation of the Plan.

**8.7     Retention of Jurisdiction**

The Plan provides for the retention of jurisdiction by the Bankruptcy Court following the Effective Date to, among other things, determine all disputes relating to Claims, Equity Interests and other issues presented by or arising under the Plan. The Bankruptcy Court will also retain jurisdiction under the Plan for any actions brought in connection with the implementation and consummation of the Plan and the transactions contemplated thereby.

## ARTICLE 9
## PROVISIONS GOVERNING DISTRIBUTIONS

**9.1     Determination of Claims**

9.1.1    Unless otherwise ordered by the Bankruptcy Court, and except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with the Bankruptcy Court by no later than sixty (60) days following the Effective Date (unless such period is extended by the Bankruptcy Court), and the Confirmation Order shall contain appropriate language to that effect.  Holders of Unsecured Claims that have not filed such Claims on or before the Bar Date shall serve notice of any request to the Bankruptcy Court for allowance to file late Unsecured Claims on the Debtors' Counsel and such other parties as the Bankruptcy Court may direct.  If the Bankruptcy Court grants the request to file a late Unsecured Claim, such Unsecured Claim shall be treated in all respects as a Class 9 Unsecured Claim. Objections to late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) sixty (60) days following the Effective Date or (b) the date thirty (30) days after the Debtors receive actual notice of the filing of such Claim.

9.1.2    Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors effect service in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Bankruptcy Cases on behalf of the Holder of a Claim.

9.1.3    Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Bankruptcy Cases, such Claim shall be estimated by the Bankruptcy Court for purposes of Allowance and Distribution.  Upon receipt of a timely-filed Proof of Claim, the Debtors or other party in interest may file a request for estimation along with an objection to the Claim set forth therein. The determination of Claims in Estimation Hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of Allowance and Distribution. Procedures for specific Estimation Hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

## ARTICLE 10
## CONDITIONS PRECEDENT

**10.1     Condition Precedent to Confirmation of the Plan**

The following is a condition precedent to Confirmation of the Plan:

10.1.1      The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order in a manner consistent with the provisions of the Plan.

10.1.2      Any objection to the Plan or Confirmation shall be overruled.

**10.2    Conditions Precedent to the Effective Date**

10.2.1      The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or may be waived by in accordance with Article 10.3 of the Plan:

10.2.1.1      The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to on the Docket of the Bankruptcy Cases and no stay of the Confirmation Order shall be in effect.

10.2.1.2      The entry and effectiveness of all necessary orders by the Bankruptcy Court and any appellate court exercising jurisdiction over the Bankruptcy Cases. If the Confirmation Order is appealed, such appeal shall toll the Effective Date until the Confirmation Order becomes a final, non-appealable order.

**10.3    Waiver of Conditions Precedent to the Effective Date**

The conditions precedent set forth in Article 10.2 of the Plan may be waived by the Debtors unless the Bankruptcy Court has entered an order prohibiting any such waiver.

## ARTICLE 11
## POST CONFIRMATION ESTATES

**11.1    Structure of Reorganized Debtors**

On the Effective Date, the Interest Holders shall retain their equity in the Reorganized Debtors.  The Interest Holders shall obtain the funds necessary to fund the New Value Contribution from an independent source.  W. Developments LLC shall remain as the managing member of the Debtors and shall continue to hold 30% membership interest in the Reorganized Debtors.  CHRG IV, LLC and Summit Investors LLC shall hold 30% and 40% membership units, respectively, of the Reorganized Debtors – or, if the funding source so requires, such other or different holders in such other percentage amounts as disclosed by the Debtors prior to the Confirmation Hearing.

**11.2     Post-Confirmation Duties**

In addition to the continuous operation of the Property, on and after the Effective Date, the Debtors shall:

(1)     Present objections to Claims as appropriate;

(2)     Cause the Distributions to occur as contemplated by the Plan; and

(3)     Comply with any other requirements of the Bankruptcy Code and directives of the Bankruptcy Court relative to the Confirmation.

**11.3     Insurance Preservation**

Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any policies of insurance that may cover any Claims against the Debtors or any other Person.

**11.4     Release of Liens**

On the Effective Date, except as otherwise provided in the Plan, all mortgages, deeds of trust, Liens or other security interests against any property of the Estates shall be automatically released.  FNBN-Rescon shall retain its liens on and security interests in the Property until its Allowed Class 2 Secured Claim is paid in full.

**11.5     No Liability for Tax Claims**

Unless a taxing Governmental Authority has asserted a Claim against the Debtors before the Bar Date or Administrative Expense Claims Bar Date established therefore, no Claim of such Governmental Authority shall be Allowed against the Debtors or the Post Confirmation Estates for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtors or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

**ARTICLE 12**
**RETENTION OF JURISDICTION**

**12.1     General Retention**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, until the Bankruptcy Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction of the Bankruptcy Cases that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out.

**12.2    Specific Purposes**

12.2.1 In addition to the general retention of jurisdiction set forth in Article 12.1, after Confirmation of the Plan and until the Bankruptcy Cases are closed, the Bankruptcy Court shall retain jurisdiction of the Bankruptcy Cases for the following specific purposes:

(1)    to allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any application for an Administrative Expense Claim, and to determine any and all objections to the allowance or priority of Claims or Equity Interests;

(2)    to determine any and all cases, controversies, suits or disputes arising under or relating to the Bankruptcy Cases, the Plan or the Confirmation Order (including regarding the effect of any release, discharge, limitation of liability, or injunction provisions provided for herein or affected hereby and regarding whether the conditions to the consummation and/or Effective Date of the Plan have been satisfied);

(3)    to determine any and all applications for allowance of compensation of Professionals and reimbursement of expenses under §§ 330, 331 or 503(b) of the Bankruptcy Code arising out of or relating to the Bankruptcy Cases; provided, however, that this retention of jurisdiction shall not require prior Bankruptcy Court approval of the payment of fees and reimbursement of expenses of Professionals after Confirmation of the Plan;

(4)    to determine any and all motions pending as of the date of the Confirmation Hearing (including pursuant to the Plan) for the rejection, assumption, or assignment of executory contracts or unexpired leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to determine the allowance of any Claims resulting from the rejection thereof or any Cure Claims;

(5)    to determine any and all motions, applications, adversary proceedings, contested or litigated matters, Causes of Action, and any other matters involving the Debtors or the Reorganized Debtors commenced in connection with, or arising during, the Bankruptcy Cases and pending on the Effective Date, including approval of proposed settlements thereof;

(6)    to enforce, interpret and administer the terms and provisions of the Plan and the Plan Documents;

(7)    to modify any provisions of the Plan to the fullest extent permitted by the Bankruptcy Code and the Bankruptcy Rules;

(8)    to consider and act on the compromise and settlement of any Claim

against or Equity Interest in the Debtors or the Estates;

(9)      to assure the performance by the Debtors of their respective obligations under the Plan;

(10)    to correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Disclosure Statement, the Plan, the Confirmation Order, or any exhibits or schedules to the foregoing, as may be necessary or appropriate to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

(11)    to enforce all orders, judgments, injunctions and rulings entered in connection with the Bankruptcy Cases;

(12)    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, including the Plan Documents;

(13)    to determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters with respect to the Debtors arising on or prior to the Effective Date or arising on account of transactions contemplated by the Plan, including to determine any motion that may be filed after the Effective Date as necessary to obtain a tax refund from the Internal Revenue Service;

(14)    to resolve any determinations which may be requested by the Debtors of any unpaid or potential tax liability or any matters relating thereto under §§ 505 and 1146 of the Bankruptcy Code, including tax liability or such related matters for any taxable year or portion thereof ending on or before the Effective Date;

(15)    to resolve any disputes concerning any release of or limitation of liability as to a nondebtor hereunder or the injunction against acts, employment of process or actions against such nondebtor arising hereunder;

(16)    to determine any motions or contested matters relating to the Causes of Action commenced in the Bankruptcy Court, whether brought before or after the Effective Date;

(17)    to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any

Person or Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(18)    to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(19)    to determine any other matters that may arise in connection with or relating to the Plan, the  Disclosure Statement, the Confirmation Order, or the Plan Documents;

(20)    to enter such orders as are necessary to implement and enforce the injunctions described herein;

(21)    to determine such other matters and for such other purposes as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law; and

(22)    to enter an order concluding and terminating the Bankruptcy Cases.

**12.3    Closing of the Bankruptcy Cases**

In addition to the retention of jurisdiction set forth in Articles 12.1 and 12.2, the Bankruptcy Court shall retain jurisdiction of the Bankruptcy Cases to enter an order reopening the Bankruptcy Cases after they have been closed.

## ARTICLE 13 MODIFICATION OF
## PLAN AND CONFIRMATION OVER OBJECTIONS

**13.1    Modification of Plan**

13.1.1  The Debtors may modify the Plan at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, and the Disclosure Statement meet applicable Bankruptcy Code and Bankruptcy Rules requirements.

13.1.2  After the Confirmation Date and before the Effective Date of the Plan, the Debtors or the Reorganized Debtors (as the case may be) may modify the Plan in a way that materially or adversely affects the interests, rights, treatment, or distributions of a Class of Claims, provided that (a) the Plan, as modified, meets applicable Bankruptcy Code requirements; (b) the Debtors or the obtains Bankruptcy Court approval for such modification, after notice and a hearing; (c) such modification is accepted by at least two-thirds in amount, and more than one-half in number, of Allowed Claims or Allowed Equity Interests voting in each Class adversely affected by such modification; and (d) the Debtors comply with Section 1125 of the Bankruptcy Code with respect to the Plan, as modified.

13.1.3 In the event any Class of Claims votes against the Plan, and the Plan is not revoked or withdrawn, the Debtors hereby request, and will be allowed, to modify the terms of the Plan to effect a "cramdown" on the dissenting Class or Classes by (a) restructuring the treatment of any Class on terms consistent with Section 1129(b)(2)(B) of the Bankruptcy Code, or (b) deleting distributions to all Classes at or below the level of the objecting Class, or reallocating such distributions, until such impaired senior Classes are paid in accordance with the absolute priority rule of Section 1129(b) of the Bankruptcy Code. The Debtors may make such modifications or amendments to the Plan and such modifications or amendments will be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice of the Confirmation Hearing. No such modifications will require any re-solicitation of acceptances as to the Plan by any Class of Claims unless the Bankruptcy Court will require otherwise.

13.1.4 Notwithstanding any provision of the Plan to the contrary, the Debtors reserve any and all rights they may have to challenge the validity, perfection, priority, scope, and extent of any Liens in respect to any Secured Claims and the amount of any Secured Claims, the Holders of which have not accepted the Plan.

## 13.2    Confirmation Over Objections

In the event any Impaired Class of Claims votes against the Plan, and the Plan is not revoked or withdrawn in accordance with Article 14.2, the Debtors request, and shall be allowed, to modify the terms of the Plan to effect a "cramdown" on such dissenting Class by (a) restructuring the treatment of any Class on terms consistent with § 1129(b)(2)(B) of the Bankruptcy Code, or (b) deleting Distributions to all Classes at or below the level of the objecting Class, or reallocating such Distributions, until such impaired senior Classes are paid in accordance with the absolute priority rule of § 1129(b) of the Bankruptcy Code. The Debtors may make such modifications or amendments to the Plan and such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice prior to the Confirmation Hearing. No such modifications shall require any resolicitation of acceptances as to the Plan by any Class of Claims or Equity Interests unless the Bankruptcy Court shall require otherwise. Notwithstanding any provision of the Plan to the contrary, reserves any and all rights it may have to challenge the validity, perfection, priority, scope and extent of any Liens in respect to any Secured Claims and the amount of any Secured Claims, the Holders of which have not accepted the Plan.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS

## 14.1    No Admissions

The Plan provides for the resolution, settlement and compromise of Claims against and Equity Interests in the Debtors. Nothing herein shall be construed to be an admission of any fact or otherwise binding upon the Debtors' Estates in any manner prior to the Effective Date.

**14.2    Revocation or Withdrawal of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation of the Plan does not occur, then the Plan shall be deemed null and void in all respects and nothing contained in the Plan shall be deemed to (a) constitute a waiver or release of any Claims against, or Equity Interests in, the Debtors' Estates or any other Person, or (b) prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

**14.3    Further Assurances**

The Debtors are authorized to execute and deliver any and all papers, documents, contracts, agreements and instruments which may be necessary to carry out and implement the terms and conditions of the Plan.

**14.4    Headings**

The headings and table of contents used in the Plan are for convenience and reference only and shall not constitute a part of the Plan for any other purpose or in any manner affect the construction of the provisions of the Plan.

**14.5    Notices**

All notices, requests or other documents in connection with, or required to be served by, the Plan shall be in writing and shall be sent by first class United States mail, postage prepaid, or by overnight delivery by a recognized courier service, to the Debtors at: Arnstein & Lehr LLP, 120 S. Riverside Plaza, Suite 1200, Chicago, IL 60606, Attn: Konstantinos Armiros.

**14.6    Governing Law**

Except to the extent that federal law (including the Bankruptcy Code or the Bankruptcy Rules) is applicable, or where the Plan or the provision of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Arizona, without giving effect to the principles of conflicts of law thereof

**14.7    Limitation on Allowance**

No attorneys' fees, punitive damages, penalties, exemplary damages, or interest shall be paid with respect to any Claim or Equity Interest except as otherwise specified in the Plan or as Allowed by a Final Order of the Bankruptcy Court.

**14.8     Estimated Claims**

To the extent any Claim is estimated for any purpose other than for voting on the Plan, then in no event shall such Claim be Allowed in an amount greater than the estimated amount.

**14.9     Consent to Jurisdiction**

14.9.1  Upon any default under the Plan, the Debtors consent to the jurisdiction of the Bankruptcy Court, or any successor thereto, and agree that it shall be the preferred forum for all proceedings relating to any such default.

14.9.2  By accepting any Distribution or payment under or in connection with the Plan, by filing any Proof of Claim, by filing any Administrative Expense Claim, by voting on the Plan, by reason of being served with notice of the filing of the Bankruptcy Cases or the Confirmation Hearing, or by entering an appearance in the Bankruptcy Cases, all Creditors, Holders of Equity Interests and other parties in interest, including foreign Creditors and foreign parties in interest, have consented, and shall be deemed to have expressly consented, to the jurisdiction of the Bankruptcy Court for all purposes with respect to any and all matters relating to, arising under or in connection with the Plan or the Bankruptcy Cases, including the matters and purposes set forth in Article 12 of the Plan. The Bankruptcy Court shall maintain jurisdiction to the fullest extent allowed under applicable law over all matters set forth in Article 12 of the Plan.

**14.10   Setoffs**

Subject to the limitations provided in § 553 of the Bankruptcy Code, the Debtors may, but shall not be required to, set off against any Claim and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, Claims of any nature whatsoever the Debtors' Estates may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim that the Debtors' Estates may have against the Holder of such Claim.

**14.11   Successors and Assigns**

The rights, benefits, duties and obligations of any Person or Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

**14.12   No Interest**

Except as expressly stated in the Plan or otherwise Allowed by a Final Order of the Bankruptcy Court, no Holder of an Allowed Claim shall be entitled to the accrual of Postpetition interest or the payment of Postpetition interest, penalties, or late charges on account of such Allowed Claim for any purpose.

**14.13   Modification of Payment Terms**

The Debtors reserve the right to modify the treatment of any Allowed Claim, as provided in § 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date, upon the consent of the Holder of such Allowed Claim.

## 14.14   Entire Agreement

The Plan sets forth the entire agreement and undertakings relating to the subject matter hereof and supersedes all prior discussions and documents. No Person or Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by such Person or Entity in writing.

## 14.15   Severability of Plan Provisions

If, prior to Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the Debtors' request, shall have the power to alter or interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term or provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable.

## 14.16   Confirmation Order and Plan Control

To the extent the Confirmation Order or the Plan is inconsistent with the Disclosure Statement or any agreement entered into between the Debtors and any third party, unless otherwise expressly provided in the Plan or the Confirmation Order, the Plan controls over the Disclosure Statement and any such agreement, and the Confirmation Order (and any other Final Orders of the Bankruptcy Court) shall be construed together and consistent with the terms of the Plan.

## 14.17   Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## 14.18   Substantial Consummation

The Plan shall be deemed to be substantially consummated within the meaning of § 1101 of the Bankruptcy Code upon commencement by the Debtors of the Distributions described in the Plan.

**14.19    Plan Documents**

The Plan Documents (if any) shall be filed with the Bankruptcy Court prior to the Confirmation Hearing. Upon their filing with the Bankruptcy Court, the Plan Documents may be inspected in the Clerk's Office during normal business hours or may be obtained from Debtors' counsel.

Dated: March 24, 2010

THE SUMMIT AT COPPER SQUARE LLC
THE SUMMIT AT COPPER SQUARE
COMMERCIAL, LLC


_____/s/ David T. Wallach_____
David T. Wallach
Sole Member of W. Developments LLC
Managing Member of the Debtors

Counsel for the Debtors

By: _____/s/ Miriam R. Stein_____
       One of Debtors' Attorneys

Konstantinos Armiros
Miriam R. Stein
ARNSTEIN & LEHR LLP
120 S. Riverside Plaza, Suite 1200
Chicago, IL 60606
(312) 876-7100
Fax: (312) 876-0288
www.arnstein.com

8956167.2